FILED
United States Court of Appeals
Tenth Circuit

January 7, 2025

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

WAYNE BROWN,

     Plaintiff - Appellant,

v.

No. 23-5133

CITY OF TULSA; CHARLES W.
JORDAN, individually and in his
official capacity as Chief of Police,
Tulsa Police Department,

     Defendants - Appellees.

_____

**Appeal from the United States District Court
for the Northern District of Oklahoma
(D.C. No. 4:19-CV-00538-WPJ-CDL)**

_____

Robert Joseph Muise (Scott Wood, Wood, Puhl & Wood, PLLC, Tulsa,
Oklahoma, with him on the briefs) American Freedom Law Center, Ann Arbor,
Michigan, for Plaintiff-Appellants.

R. Lawson Vaughn, III, Senior Assistant City Attorney (Kristina L. Gray,
Litigation Division Manager, with him on the briefs) City of Tulsa, Tulsa,
Oklahoma, for Defendants-Appellees.

_____

Before **CARSON**, **ROSSMAN**, and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

_____

This appeal requires us to consider a police officer's First Amendment rights as they relate to social media posts that may violate department policy. Plaintiff Wayne Brown (Brown) was terminated as a Tulsa police officer after a private citizen brought several of his old Facebook posts to the attention of the City of Tulsa and the Tulsa Police Department. As a result of his termination, he brought two claims under 42 U.S.C. § 1983 and a wrongful discharge claim under Oklahoma law against the City of Tulsa and Tulsa Police Department Chief Charles W. Jordan (Chief Jordan).

On appeal, Brown challenges the district court's dismissal of his federal claims pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6) and its decision to then decline supplemental jurisdiction over his state law claim. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

# I

## A[1]

In January 2019, Brown became an at-will employee with the Tulsa Police Department. After graduating from the police academy in August 2019, Brown began field training.

---

[1] In reviewing a Rule 12(b)(6) dismissal, we accept the truth of all well-pleaded factual allegations in Brown's operative complaint and draw all reasonable inferences in Brown's favor. *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).

Prior to and during his employment, Brown maintained a Facebook page under his nickname "Duke" Brown. Sometime on or before September 4, 2019, Tulsa activist Marq Lewis (Lewis) posted on Facebook[2] commentary concerning Brown's social media posts.[3] The body of Lewis's original post (prior to any updates) stated:

Meet the newest Tulsa Police Officer Duke Brown.

---

[2] We note three points regarding Lewis's Facebook post:

First, the City of Tulsa attached a screenshot of Lewis's Facebook post to their motion to dismiss. We may consider this screenshot because Brown's operative complaint quotes from and references it and Brown does not object to its authenticity. *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.").

Second, both the screenshot and the operative complaint indicate that the post was updated on September 4, 2019, but neither confirms the original date it was posted. *See* Aple. App. at 34; Aplt. App. at 14 ¶ 36 ("On September 4, 2019, at 8:44 a.m., Marq Lewis posted on his Facebook page the following: 'Update: Received confirmation from 2 sources that Duke Brown has been terminated.'").

Third, the operative complaint does not clarify where Lewis made the post to – whether on his personal Facebook page or in a Facebook group – nor does it indicate the post's privacy settings, such as whether it was visible only to Lewis's Facebook friends or to the public on Facebook.

[3] The complaint does not explicitly specify whether Brown's Facebook page was set to public or private, the privacy settings on the posts at the time they were made and when they were screenshot, or how Lewis accessed them.

3

Officer Brown just recently graduated from the academy and was greeted with a warm reception from the Chief of Police Chuck Jordan and Mayor Bynum.

It's been brought to my attention that officer Brown has some very offensive social media images.

Image of The president riding a lion with the Confederate flag.

Image of the a fist, acknowledging a fight against the religious faith, Islam.

Image of the punisher with crosshairs. This image originated from the American sniper Chris Kyle who was very controversial with killing Iraqi citizens along with killing American citizens during Katrina.

The Oath of Office that every police officer takes says that they will protect all citizens. Having these social media posts is a clear indication that Officer Brown has biases towards people who practice Islam and Black Americans.

These images are a clear violation of the Tulsa Police Department's social media policy.

I'm very curious why the recruiter did not verify this officer's social media platforms before offering this person a job that gives a license to kill.

Do better Tulsa Police Department!

Aple. App. at 34 (references to [sic] not included). Lewis's original post included three screenshots from Brown's Facebook page.

One screenshot depicted Brown posting an image of "yet-to-be-president Donald Trump," on or about August 6, 2015:

4



Aplt. App. at 20 ¶ 72(A).

Another screenshot depicted Brown posting an image "making the point that Americans (particularly Christians, such as [Brown], who will not convert or submit to Islam as a matter of religious conviction) will not surrender or submit to sharia-supremacism," on or about November 15, 2015:



*Id.* at 21 ¶ 72(B).

And a third screenshot depicted Brown posting an image "created by the famous American sniper and decorated war hero Chris Kyle superimposed over the American flag with a thin blue line—[an] image . . . associated with the 'blue lives matter' movement," on or about March 24, 2016:



*Id.* at 21 ¶ 72(C).

At some point, Lewis's post was updated to include additional screenshots of Brown's prior Facebook posts. *See* Aple. App. at 34 ("Update: I'm adding more images. Thanks citizens for finding these.").

One additional screenshot depicted Brown reposting an image originally posted by "The Inmates of the Asylum," on or about March 19, 2013:



Aplt. App. at 23–24 ¶ 73(E).

Another screenshot depicted Brown reposting an image of "Michelle Obama with a message urging her to take her 'South Chicago Values' and 'Socialist Family' back to Chicago," originally posted by "Prepare to Take America Back," and reposted by Brown on or about March 22, 2013:



Aplt. App. at 22 ¶ 73(A). Additionally, one screenshot depicted Brown reposting an image originally posted by "Stop Islamization of the world," on or about March 25, 2013:



*Id.* at 23 ¶ 73(C).

Another screenshot depicted Brown reposting an image originally posted by "Police Officers," on or about April 26, 2013:



*Id.* at 22 ¶ 73(B).

Finally, one screenshot depicted Brown posting the following image in or about September 2014:



*Id.* at 23 ¶ 73(D).

Lewis's post also included a screenshot depicting Brown updating his profile picture to an image of himself and a fellow officer, both in uniform, on or about August 15, 2019:



*Id.* at 24 ¶ 73(F). This updated profile picture was the only post of those shared by Lewis that Brown made to Facebook during his employment with the Tulsa Police Department.

On the morning of September 4, 2019, at approximately 11:11 a.m. and before Brown arrived at work, a friend forwarded him a copy of Lewis's Facebook post. Prior to receiving this message, Brown had no indication that his Facebook posts were a potential issue for his job as a police officer.

At approximately 2:05 p.m. that same day, Brown was told by Captain Thom Bell to come into the meeting room where Captain Luke Sherman and

Internal Affairs officers were waiting. Brown entered the room, the door was closed behind him, and he was instructed to remove his gun belt. Brown complied and handed his gun belt to the Internal Affairs officer, who then laid it on the table. Brown was told to sit down, which he did. He was then handed an Interoffice Correspondence written from Chief Jordan dated September 4, 2019, with the subject line, "Personnel Order #19-257 Termination," and was instructed to read it. *Id.* at 15 ¶ 43. The correspondence stated that Brown's employment was "hereby terminated effective immediately," due to the Tulsa Police Department becoming "aware of social media postings made by [Brown] that violate Department Rules & Regulations and Policies and Procedures."[4] *Id.* at 15 ¶¶ 43–44.

One of the policies cited in the Interoffice Correspondence was "Policy and Procedure 31-324 (Social Media and Networking) Procedures C.6.," which provides:

> Department personnel should be mindful that their speech, when using social media, is public and becomes part of the worldwide electronic domain. Therefore, adherence to the department's code of conduct is required in the personal use of social media. In

---

[4] The Interoffice Correspondence does not specifically identify which of Brown's social media posts led to his termination. *See* Aplt. App. at 34. Brown alleges that the August 6, 2015 post, November 15, 2015 post, and March 24, 2016 post "likely prompted [his] termination . . . ." *Id.* at 20 ¶ 72. However, his operative complaint later alleges that during an unemployment benefits appeal hearing, Deputy Chief Eric Dalgliesh of the Tulsa Police Department testified that Brown was terminated only for the August 6, 2015 and the March 24, 2016 posts.

particular, department personnel are prohibited from posting speech containing obscene or sexually explicit language, images, acts, and statements or other forms of speech that ridicule, malign, disparage, or otherwise express bias against any race, religion, or protected class of individuals.

*Id.* at 15 ¶ 45.

During the meeting, and consistent with the Interoffice Correspondence, Brown was advised that his employment was being terminated because he had violated the Tulsa Police Department's social media policy. Specifically, he was "informed that he posted offending social media posts on his private Facebook page, and that these posts were sent by a complaining citizen to either the mayor's office or [Chief] Jordan's office . . . ." *Id.* at 16 ¶ 49.

After receiving his termination notice, Brown inquired if he would be given an opportunity to present "his side of it," to which Captain Bell and an Internal Affairs officer responded that "they were not there to listen to anything [Brown] had to say and that he needed to sign the termination paper." *Id.* at 16 ¶ 50. Brown protested, asserting that "this was not right" and that "he had done nothing wrong." *Id.* at 16 ¶ 51. He pointed out that the posts were three to six years old and labeled the termination as complete "BS." *Id.* at 17 ¶ 54. Brown then asked if he could talk to Chief Jordan about this termination decision. The officers did not provide a definitive answer but mentioned they would pass his message along to Chief Jordan.

12

To avoid further embarrassment, Brown requested that the officers not make him do a "shame walk" in front of everyone in the office as he left, to which they agreed. *Id.* at 17 ⁋ 57. Reluctantly, Brown then signed the Interoffice Correspondence. His patrol car was cleaned out and he was subsequently escorted from the meeting room out through a back door. At this point, Brown felt "totally dejected, embarrassed, and humiliated." *Id.* at 18 ⁋ 61.

The next day, September 5, 2019, at around 1:00 p.m., Brown came back to the Tulsa Police Department to return the remaining department property in his possession and to retrieve personal headphones he had left. Upon giving Brown his personal headphones, Captain Bell told Brown something to the effect of, "On a personal note I didn't want to do this . . . and I think its [sic] BS, but understand I have a job to do as well and best of luck to you in the future . . . ." *Id.* at 19 ⁋ 64. Captain Bell also mentioned to Brown that "he was a good officer" and that the Tulsa Police Department "needed people like him." *Id.* Brown was never given an opportunity to discuss the matter with Chief Jordan.

Shortly after Brown's termination, "news reports began circulating and social media erupted, condemning [Brown] and vilifying him as a racist and an Islamophobe." *Id.* at 19 ⁋ 66. In response to a media inquiry, Sergeant Shane Tuell, the Tulsa Police Department's Public Information Officer, wrote: "Early

yesterday morning the police department was notified of some questionable social media posts by one of our officers. The Chief . . . immediately ordered internal affairs to open an investigation, and within one hour and 15 minutes of receiving the complaint the officer was terminated." *Id.* at 19–20 ¶ 68. The City of Tulsa and Chief Jordan confirmed with the media that Brown was terminated because they believed that Brown had violated the Tulsa Police Department social media policy prohibiting personnel "from posting forms of speech that express bias against any race, religion, or protected class of individuals." *Id.* at 20 ¶ 69.

Brown alleges that being fired has caused him public humiliation, embarrassment, anger, and stress. He further alleges that this termination has undermined the trust and confidence that Tulsa Police Department officers have in their leadership, particularly in Chief Jordan, whom they believe "will 'throw them under the bus' to promote political correctness and to appease political activists . . . ." *Id.* at 26 ¶ 86.

**B**

On October 9, 2019, Brown filed a lawsuit in the United States District Court for the Northern District of Oklahoma. Brown filed his operative complaint on December 27, 2019, against the City of Tulsa and Chief Jordan, individually and in his official capacity as Chief of Police for the Tulsa Police Department. Therein, Brown brought three claims against both Defendants:

14

- **Count One** alleged a claim under 42 U.S.C. § 1983, asserting that Defendants violated his First Amendment free speech rights by terminating his employment based on the content and viewpoint of his speech made as a private citizen speaking on matters of public concern, and by enforcing a social media policy that, both facially and as applied, punished him for expressing his political and religious views;

- **Count Two** alleged a claim under 42 U.S.C. § 1983, asserting that Defendants violated the Equal Protection Clause of the Fourteenth Amendment by selectively terminating his employment based on the content and viewpoint of his political and religious beliefs, and by arbitrarily enforcing policies to discriminate against him to appease those opposed to his views; and

- **Count Three** alleged a wrongful discharge claim under Oklahoma law, also known as a *Burk* claim, asserting that Brown, an at-will employee, was unlawfully terminated in violation of Oklahoma public policy, as articulated in the Oklahoma Constitution, the First Amendment, and the City's policy prohibiting suspension, removal, or demotion based on religious or political beliefs.

With respect to remedies, Brown requested declaratory and injunctive relief, as well as actual and nominal monetary damages.

On February 3, 2020, the City of Tulsa and Chief Jordan each separately filed a motion to dismiss pursuant to Rule 12(b)(6). The City of Tulsa in its motion argued:

(1) Brown's First Amendment claim failed as a matter of law because the City's interest as an employer outweighed Brown's free speech interest;

(2) Brown failed to allege a cognizable Equal Protection claim; and

(3) Brown's *Burk* claim should be dismissed.

15

And Chief Jordan in his motion argued:

(1) the claims against him in his official capacity are effectively claims against the City of Tulsa and should be dismissed as duplicative;

(2) both 42 U.S.C. § 1983 claims against him in his individual capacity should be dismissed because he is entitled to qualified immunity; and

(3) Brown's *Burk* claim should be dismissed.

On November 21, 2023, the district court issued one order disposing of both motions to dismiss. It dismissed the claims against Chief Jordan in his official capacity as duplicative of the claims against the City of Tulsa. The district court then dismissed Brown's First Amendment claim against the City of Tulsa for failure to state a claim, concluding that the City's interest in maintaining a police force that instills public confidence and discourages partisanship outweighed his free speech rights, and dismissed the same claim against Chief Jordan in his individual capacity, holding that he is entitled to qualified immunity. The court likewise dismissed Brown's Equal Protection claim against both the City and Chief Jordan for failure to state a claim, determining that Brown alleged a "class-of-one" theory of Equal Protection foreclosed by Supreme Court precedent. Finally, after dismissing the federal claims, the district court declined to exercise supplemental jurisdiction over Brown's state law claim.

On November 21, 2023, final judgment was entered, and, on December 9, 2023, Brown filed a timely notice of appeal. On appeal, Brown challenges four rulings by the district court:

(1) the dismissal of his First Amendment claim against the City of Tulsa for failure to state a claim under Rule 12(b)(6),

(2) the conclusion that Chief Jordan is entitled to qualified immunity on his First Amendment claim,

(3) the dismissal of his Fourteenth Amendment Equal Protection claim against both the City of Tulsa and Chief Jordan for failure to state a claim under Rule 12(b)(6), and

(4) the decision to decline supplemental jurisdiction over his *Burk* claim.

## C

Before addressing the merits, we first clarify which 42 U.S.C. § 1983 theories of liability are before us on appeal. Brown sued the City of Tulsa and Chief Jordan, in both his individual capacity and official capacity as Chief of Police for the Tulsa Police Department, seeking declaratory and injunctive relief, as well as monetary damages from both defendants. The district court correctly dismissed the claims against Chief Jordan in his official capacity as duplicative of the claims against the City of Tulsa. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest

17

is the entity."). Also, Brown's claims against Chief Jordan in his individual capacity for declaratory and injunctive relief are non-cognizable and were properly dismissed as well. *Chilcoat v. San Juan Cnty.*, 41 F.4th 1196, 1214 (10th Cir. 2022) ("Under § 1983, a plaintiff cannot sue an official in their individual capacity for injunctive or declaratory relief.").

This leaves the following 42 U.S.C. § 1983 theories of liability for our review: two § 1983 claims (for violations of the First and Fourteenth Amendments) against the City of Tulsa seeking declaratory relief, injunctive relief, and monetary damages, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) ("Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief . . . ."), and two § 1983 claims (for violations of the First and Fourteenth Amendments) against Chief Jordan in his individual capacity for monetary damages, for which he may assert a defense of qualified immunity.

## II

We next outline the legal standards applicable to a Rule 12(b)(6) motion to dismiss, a § 1983 municipal liability claim, and an individual-capacity § 1983 claim.

## A

Our review of a district court's ruling on a motion to dismiss under Rule 12(b)(6) is de novo. *Johnson v. Smith*, 104 F.4th 153, 167 (10th Cir. 2024).

Pursuant to Rule 12(b)(6), a party may move for dismissal if the complaint fails "to state a claim upon which relief can be granted . . . ." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

This pleading standard does not impose a probability requirement but demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. Although the court must accept the truth of all properly alleged facts and draw all reasonable inferences in the plaintiff's favor, the plaintiff still "must nudge the claim across the line from conceivable or speculative to plausible." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021).

Importantly, in assessing whether a plaintiff has stated a claim for relief, a court must restrict its review to only the "allegations within the four corners of the complaint," and cannot consider other pleadings or external allegations. *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1286 n.1 (10th Cir. 2019) (quoting *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994)). Exceptions to this rule are limited to: (1) documents attached to the complaint as exhibits, (2) documents referenced in the complaint that are central to the plaintiff's

claims, provided their authenticity is undisputed, and (3) matters subject to judicial notice. *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

As we have emphasized, "[g]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1276 (10th Cir. 2023) (quoting *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009)) (second alteration in original). We impose a "low bar for surviving a motion to dismiss," *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1034 (10th Cir. 2020), and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely," *Id.* (quoting *Dias*, 567 F.3d at 1178).

### B

A plaintiff may bring a 42 U.S.C. § 1983 suit for alleged constitutional violations that arise from the policies or practices of a municipal police department. Typically, if a plaintiff alleges wrongdoing on the part of a municipal police department, the plaintiff must name as a defendant the county, city, or other form of local government that oversees the police department, rather than the police department itself. *See, e.g.*, *Martinez v. Winner*, 771 F.2d 424, 444 (10th Cir. 1985) (dismissing the "City of Denver Police Department" as a defendant because it "is not a separate suable entity"

20

from the City of Denver). This is because municipal departments, such as police departments, are generally not considered separate legal entities from the local government they serve. *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313 (5th Cir. 1991) ("In order for a plaintiff to sue a city department, it must 'enjoy a separate legal existence.'" (quoting *Mayes v. Elrod*, 470 F. Supp. 1188, 1192 (N.D. Ill. 1979))). That is, "unless the true political entity has taken explicit steps to grant the servient agency with jural authority, the agency cannot engage in any litigation except in concert with the government itself." *Id.*

"Local governing bodies" overseeing a municipal department "can be sued directly under § 1983" for declaratory and injunctive relief, as well as damages, where "the action that is alleged to be unconstitutional implements or executes" a policy or custom attributable to the municipality. *Monell*, 436 U.S. at 690–91. A policy can include "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. However, a formal policy need not originate from the local government itself; it can be issued by a municipal department or its officials.[5] *Id.* at 694 (holding that a local government is liable "when execution of a government's policy or custom, whether made by its lawmakers or *by those*

---

[5] We clarify this point because the district court stated that the Tulsa Police Department's social media policy "may or may not be a City policy." Aple. App. at 78.

*whose edicts or acts may fairly be said to represent official policy*, inflicts the injury that the government as an entity is responsible under" (emphasis added)).

*Monell* demonstrates how this works in practice. *Id.* at 660–61. There, the plaintiffs challenged formal policies of the Department of Social Services and the Board of Education of the city of New York, which at the time required all pregnant employees to take an unpaid leave of absence without regard to medical necessity. *Id.* Those policies were issued by the city's departments, not literally by the city itself, yet the city was still liable for them. *Id.*

## C

A plaintiff may also bring suit under 42 U.S.C. § 1983 against an individual police officer in their personal capacity, seeking monetary damages for alleged constitutional violations. In defending against such a claim, "an official [sued in their individual capacity] may plead an affirmative defense of qualified immunity." *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1307 (10th Cir. 2015). "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

When a defendant asserts qualified immunity at the motion to dismiss phase, the plaintiff "must allege facts sufficient to show (assuming they are true) that the [1] defendant[] plausibly violated their constitutional rights, and that [2] those rights were clearly established at the time." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008). Courts may address these two inquiries in any order. *Pearson*, 555 U.S. at 236. But if the plaintiff fails to satisfy either prong, a court must grant qualified immunity. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

A right is clearly established when, at the time of the challenged conduct, "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that [they] [were] violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). A plaintiff can demonstrate that a right is clearly established in three ways. First, a "materially similar" published case from the Supreme Court or Tenth Circuit may give an official fair notice that their specific conduct would violate a constitutional right. *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017). Second, the plaintiff can point to the "clearly established weight of authority from other courts . . . ." *Ullery v. Bradley*, 949 F.3d 1282, 1291 (10th Cir. 2020) (quoting *Toevs v. Reid*, 685 F.3d 903, 916 (10th Cir. 2012)). In other words, even if there is no Supreme Court or Tenth Circuit "case directly on point," a "consensus of cases of persuasive authority" may provide fair warning of unlawful conduct.

23

*Ashcroft v. al–Kidd*, 563 U.S. 731, 741–42 (2011) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). Finally, there can be the rare case or "extreme circumstance[]" where the conduct in question has not previously been held unlawful, but a government official may still have notice that their conduct violates a constitutional right because it is so apparent as to apply with obvious clarity. *Frasier v. Evans*, 992 F.3d 1003, 1015 (10th Cir. 2021) (quoting *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (per curiam)).

## III

With those legal standards in mind, we now turn to the merits of this appeal. First, we assess whether the district court erred in dismissing Brown's First Amendment free speech claim under Rule 12(b)(6). Next, we consider whether the district court erred in dismissing Brown's Fourteenth Amendment Equal Protection claim under Rule 12(b)(6). Finally, we evaluate whether the district court erred in declining to exercise supplemental jurisdiction over his state law claim.

## A

Brown's First Amendment free speech retaliation claim is made in the public employment context. The basis of his claim is that "Defendants terminated [his] employment with the [Tulsa Police Department] based on the content and viewpoint of [his] speech while [he] was [speaking as] a private citizen commenting on matters of public concern." Aplt. App. at 28. According

24

to Brown, "Defendants' [s]ocial [m]edia [p]olicy, facially and as applied to punish [him] for his private speech, violates the Free Speech Clause of the First Amendment." *Id.* Brown argues that the district court erred in dismissing his First Amendment claim against the City of Tulsa for failure to state a claim under Rule 12(b)(6) because it concluded that the City's interest in maintaining a police force that instills public confidence and discourages partisanship in law enforcement outweighed his free speech rights, and in ruling that Chief Jordan in his individual capacity was shielded by qualified immunity. We agree.

## 1

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The First Amendment applies to state or local government employers, such as the City of Tulsa, vis-à-vis the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666 (1925) (incorporating the First Amendment against the states).

Public employees do not "relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983). To the contrary, the Supreme Court has long

recognized that "public employees are often the members of the community who are likely to have informed opinions as to the operations of their public employers, operations which are of substantial concern to the public." *City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam). "Were they not able to speak on these matters, the community would be deprived of informed opinions on important public issues." *Id.* As such, we do not take lightly "[o]ur responsibility . . . to ensure that citizens are not deprived of fundamental rights by virtue of working for the government . . . ." *Connick*, 461 U.S. at 147.

At the same time, there is the "common sense realization that government offices could not function if every employment decision became a constitutional matter." *Id.* at 143. "Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "When [government employees] speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." *Id.* at 419.

Thus, in juggling these competing interests, courts are tasked with a delicate balancing act: "the First Amendment protection of a public employee's speech depends on a careful balance 'between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of

the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Lane v. Franks,* 573 U.S. 228, 231 (2014) (quoting *Pickering v. Bd. of Ed.,* 391 U.S. 563, 568 (1968)) (alteration in original).

To prevail on a First Amendment retaliation claim in the public employment context, the plaintiff must establish the following elements:

> (1) their speech was not made pursuant to their official duties, *Garcetti,* 547 U.S. at 421;
>
> (2) their speech was on a matter of public concern, *Connick,* 461 U.S. at 146;
>
> (3) the government's interests as the plaintiff's employer in promoting the efficiency of the public services it provides do not outweigh the plaintiff's free speech interests, *Pickering,* 391 U.S. at 568;
>
> (4) the plaintiff's speech was a substantial or motivating factor in the adverse employment action taken against them, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); and
>
> (5) the government would not have reached the same employment decision absent the plaintiff's speech, *id.*

The first three elements "are ordinarily matters of law for a court to decide, and the final two [elements] are ordinarily questions of fact." *Singh v. Cordle,* 936 F.3d 1022, 1034 (10th Cir. 2019). Only the third element is disputed and at issue in this appeal.

27

**2**

The third element, also known as *Pickering* balancing, requires the court to balance the employee's right to free speech against the government's interests as an employer. *Pickering,* 391 U.S. at 568. This test applies even when the employee engages in "'speech' which is off the job and unrelated to any internal functioning of the department." *Flanagan v. Munger,* 890 F.2d 1557, 1562 (10th Cir. 1989). "Arguably, 'the only public employer interest that can outweigh a public employee's recognized speech rights is the interest in avoiding direct disruption, by the speech itself, of the public employer's internal operations and employment relationships.'" *Flanagan,* 890 F.2d at 1566 (10th Cir. 1989) (quoting *Berger v. Battaglia,* 779 F.2d 992, 998 (4th Cir. 1985)); *Fields v. City of Tulsa,* 753 F.3d 1000, 1014–15 (10th Cir. 2014).

When the adverse employment action occurs "long after" the plaintiff's speech occurred, the government must demonstrate "actual disruption . . . ."[6] *Bailey v. Indep. Sch. Dist. No. 69*, 896 F.3d 1176, 1183 (10th Cir. 2018) (quoting

---

[6] It is an open question whether speech initially made at an earlier point in time but continuously published and accessible in real-time (such as a book, social media post, or website) requires the government to prove actual disruption, or if anticipated disruption alone is sufficient to justify taking an adverse employment action. In other words, does this inquiry focus solely on the moment the speech was made or does it also account for the ongoing nature of the speech if the content of the speech (such as a social media post) remains accessible? Because the outcome of this appeal does not require that we answer this interesting, yet vexing question, we decline to do so here.

*Kent v. Martin*, 252 F.3d 1141, 1146 (10th Cir. 2001)). However, when the adverse action follows "soon after" the speech, the employer's intent to "avoid actual disruption" suffices. *Kent*, 252 F.3d at 1145. In such cases, we will "generally 'defer to a public employer's reasonable predictions of disruption,' as long as the predictions are supported by specific evidence." *Deschenie v. Bd. of Educ. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1279 (10th Cir. 2007) (quoting *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1347 (10th Cir. 1998)). The government bears the burden of proving – *with evidence* – both its specific interest in taking the adverse employment action against the plaintiff and that it acted based on that interest, rather than for another reason. *See Bailey*, 896 F.3d at 1183.

To assess whether the speech disrupts workplace functioning, we consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1207 (10th Cir. 2007) (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)). The context, including the manner, time, and place of the plaintiff's speech, as well as the events leading up to it, is highly relevant to this inquiry. *Lytle v. City of Haysville*, 138 F.3d 857, 863–64 (10th Cir. 1998). However, we must

balance Brown's "interest in engaging in free speech, not the value of the speech itself." *Flanagan*, 890 F.2d at 1565.

Ultimately, the government's burden to justify an adverse employment action against the plaintiff varies depending on the nature of the speech and the position held by the employee. *See Connick*, 461 U.S. at 150. For example, the more important the speech is to the public discourse, the greater the burden on the employer to justify responding adversely to it. *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1213 (10th Cir. 1998). Similarly, the government's interest in addressing an employee's speech will depend on "the extent of authority and public accountability the employee's role entails." *Id.* (quoting *Rankin*, 483 U.S. at 390). Employees in confidential, policymaking, or public-facing positions must exercise greater caution because their speech is more likely to disrupt their employer's effective functioning. *Id.*

**3**

Because the district court granted both Defendants' Rule 12(b)(6) motions to dismiss, we must next examine how *Pickering* balancing applies at the motion to dismiss stage. When assessing whether a plaintiff has sufficiently pled a "claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), the court must limit its analysis to the "allegations within the four corners of the complaint," *Waller*, 932 F.3d at 1286 n.1 (quoting *Mobley*, 40 F.3d at 340).

We require facts to make a complaint plausible, but we do not require a plaintiff to plead facts over which it has no personal knowledge. *See* Fed. R. Civ. P. 11(b)(3) (requiring "the factual contentions [within the complaint] have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery"); *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (recognizing the concern that "plaintiffs will need discovery before they can satisfy plausibility requirements when there is asymmetry of information, with the defendants having all the evidence" (quoting *Gee*, 627 F.3d at 1185)). Applied in this context, when a plaintiff pleads a First Amendment retaliation claim, they likely have no way of knowing the government's specific interest in taking adverse action against them or what internal governmental disruption – whether actual or anticipated – the speech caused. The information required to conduct *Pickering* balancing is generally accessible only to the employer.

To overcome this "asymmetry of information," *Khalik*, 671 F.3d at 1191 (quoting *Gee*, 627 F.3d at 1185), the plaintiff must first conduct discovery. Without discovery to uncover facts beyond their personal knowledge, the plaintiff cannot allege facts addressing both sides of the scale for a *Pickering* balancing analysis.

Recognizing this reality, we have held that the government bears the burden of demonstrating its interest and proving disruption. *See Bailey*,

896 F.3d at 1183. Put differently, the plaintiff cannot reasonably be expected to allege facts that support the government's burden on the third element of a First Amendment retaliation claim.

For all these reasons, conducting *Pickering* balancing is usually inappropriate – if not impossible – at the motion to dismiss stage. Several of our sister Circuits have echoed this point,[7] and we have likewise recognized it, though in unpublished, non-precedential decisions. *See Trant v. Oklahoma*, 426 F. App'x 653, 661–62 (10th Cir. 2011) (unpublished) (declining to conduct *Pickering* balancing at the motion to dismiss stage and highlighting that such

---

[7] *See, e.g., Garza v. Escobar*, 972 F.3d 721, 727 (5th Cir. 2020) ("'[I]n stating a prima facie [First Amendment retaliation claim] at the motion-to-dismiss stage of a case, there is a rebuttable presumption that no balancing is required to state a claim.' . . . '[T]he rebuttable presumption applies because reasonable inferences drawn from a complaint, obviously drafted by the aggrieved employee, will *generally* lead to a plausible conclusion that the employee's interest in commenting on matters of public concern outweighs the employer's interest in workplace efficiency.'" (quoting *Burnside v. Kaelin*, 773 F.3d 624, 628 (5th Cir. 2014))); *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119–20 (7th Cir. 2013) ("[The plaintiff] also maintains that we cannot affirm the dismissal of his suit on this ground because the record is not developed enough to weigh Defendants' and [plaintiff's] respective interests. We have previously noted that this analysis 'can seldom be done on the basis of the pleadings alone.'" (quoting *Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir. 2002))); *Perry v. McGinnis*, 209 F.3d 597, 607 (6th Cir. 2000) ("In many cases, due to inadequate factual development, the [*Pickering*] balancing test 'cannot be performed on a 12(b)(6) motion.'" (citation omitted)); *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 785 (9th Cir. 1997) (Fletcher, J., concurring in part and dissenting in part) ("In order to conduct the *Pickering* balancing analysis, we must weigh evidence regarding [the plaintiff's] and his employer's relative interests; such weighing is inappropriate, if not impermissible, at the dismissal stage.").

balancing is typically assessed at summary judgment "where an adequate factual record had been developed to actually 'show,' rather than merely speculate about, the employer's interest"); *Lander v. Summit Cnty. Sch. Dist.*, 109 F. App'x 215, 221 (10th Cir. 2004) (unpublished) ("Such a balancing test, however, is inappropriate in evaluating a dismissal under [Rule] 12(b)(6) as no countervailing state interest could have been alleged since the claim is evaluated solely upon the pleadings of the plaintiff.").

This same rationale is why, in a First Amendment retaliation claim in the public employment context, qualified immunity usually cannot be afforded at the motion to dismiss stage either. *See Navab-Safavi v. Glassman*, 637 F.3d 311, 318 (D.C. Cir. 2011) ("The [defendant] asserts its qualified immunity, but we are unable to determine without an evidentiary record whether any act it committed in defense of those functions constituted a violation of clearly established rights, or even in general terms, where the *Pickering* balancing tips."). Practically speaking, the plaintiff will not know what interest the government will assert, how it will assert it, or what disruption the government claims the speech caused, making it impossible for the plaintiff to (1) allege facts sufficient to show that the defendant "plausibly violated their constitutional rights," and (2) identify a materially similar case where the employee prevailed to demonstrate that their First Amendment right was clearly established. *Robbins*, 519 F.3d at 1249.

In sum, "application of the *Pickering* balancing test will be possible only after the parties have had an opportunity to conduct some discovery." *Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997). By granting the motions to dismiss, the district court erred by jumping the gun on conducting the balancing test before the parties proceeded to discovery.

### 4

The City of Tulsa, in its motion to dismiss, introduced several facts not pled by Brown in the operative complaint to support its burden under the third element.[8] By relying on these facts in balancing the parties' interests, which

---

[8] We highlight a few relevant examples:

- "Plaintiff's posts then created such a public disruption that Chief Jordan and the Tulsa Police Department received numerous inquiries from concerned citizens." Aple. App. at 23.

- "In this case, however, TPD did experience <u>significant actual disruption</u>. Marq Lewis' post was shared 300 times. As a result, the police department received phone calls and other inquiries from concerned citizens and from the news media about the Plaintiff's offensive posts." *Id.* at 24.

- "Plaintiff's posts caused public outrage and disruption and harmed the public's trust in Plaintiff as a Tulsa Police Officer and that he would treat <u>all</u> members of the community fairly. Plaintiff's posts threatened to set back continuing efforts by TPD to work with various Tulsa communities to build greater levels of trust between the Police Department and those communities." *Id.*

- "Plaintiff's posts exhibited highly offensive content, glorified violent behavior, and caused significant disruption from the community." *Id.* at 26.

were not alleged within the four corners of Brown's complaint nor fall under a recognized exception, the district court clearly erred. *See* Aplt. App. at 51–54 ("Defendant City contends—*uncontroverted by Plaintiff*—that the posts 'created such a public disruption that Chief Jordan and the Tulsa Police Department received numerous inquiries from concerned citizens,' and the posts 'caused public outrage and disruption[,] harmed the public's trust in Plaintiff as a Tulsa Police Officer' and set back the efforts to build trust between TPD and the community." (emphasis added and citations omitted)). Contrary to the district court's suggestion, Brown was not required to controvert any facts alleged by the City of Tulsa at the 12(b)(6) stage. In fact, no plaintiff is required to controvert facts offered by any defendant in the first instance at the 12(b)(6) stage. *See Cuervo v. Sorenson*, 112 F.4th 1307, 1312 (10th Cir. 2024).

Reviewing Brown's operative complaint de novo, he makes no allegations in support of Defendants' burden under the third element. The only conceivably relevant allegations are that the news media covered the story, and that Brown's firing undermined the trust and confidence of Tulsa Police Department officers in their leadership, suggesting Defendants would "'throw them under the bus' to promote political correctness and to appease political activists . . . ." Aplt. App. at 26 ¶ 86. However, these allegations fail to satisfy Defendants' burden of proving that Brown's speech caused disruption to the

35

Tulsa Police Department's *internal operations*. First, there are no allegations that these events caused internal disruptions; second, they occurred *after* Brown's termination; and third, they resulted more from the firing itself than from Brown's Facebook posts.

Moreover, the district court construed Brown's allegation *against him*, rather than in his favor, as required by the Rule 12(b)(6) standard. *Brooks*, 985 F.3d at 1281. In his operative complaint, Brown alleged that any internal disruption was caused by the City of Tulsa, which terminated him just an hour and 15 minutes after being notified of Brown's Facebook posts and then publicized the decision to the media. Brown alleged this rush to judgment caused the City of Tulsa's police officers to no longer respect Chief Jordan, fearing that he would "throw them under the bus" too, if it was politically useful for him to do so. Aplt. App. at 26 ⁋ 86. These facts support his claim, rather than undermine it. The district court erred by citing Brown's allegations in support of dismissal and concluding that Brown alleged that he – not the City of Tulsa – caused internal disruption.

Consequently, Brown successfully states a claim for First Amendment retaliation, and the district court erred in dismissing this claim against the City of Tulsa. For similar reasons, the district court also erred in granting Chief Jordan qualified immunity and dismissing the claim against him in his personal capacity. Because the district court erred in both applying the

*Pickering* balancing test and in granting qualified immunity at the motion to dismiss stage, we reverse the dismissal of Brown's First Amendment retaliation claim against both the City of Tulsa and Chief Jordan in his individual capacity.

**B**

Next, we turn to Brown's Fourteenth Amendment Equal Protection claim. The crux of his claim is that "Defendants chose to selectively enforce their policies, practices, procedures, and/or customs against [him] out of an arbitrary desire to discriminate against [him] because of the content and viewpoint of his political beliefs" in violation of the Equal Protection Clause. Aplt. App. at 29. In other words, Brown argues that the Tulsa Police Department allowed other public employees to use Facebook because their views were deemed acceptable, while denying him the same opportunity based on his less favored or more controversial views. Brown asserts that the district court erred by incorrectly classifying his Equal Protection claim as a "class-of-one" claim.

**1**

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "Equal [P]rotection jurisprudence has traditionally been

concerned with governmental action that disproportionally burdens certain classes of [persons]." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215–16 (10th Cir. 2011). Nonetheless, a plaintiff can still bring an Equal Protection claim even without alleging membership in a specific class by asserting they were "intentionally treated differently from others similarly situated" without a rational basis under a "class-of-one" theory. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). A typical "class-of-one" case arises when a public official singles out an individual without any legitimate reason, prompted instead by personal motive. *Kan. Penn Gaming, LLC*, 656 F.3d at 1216.

However, a "class-of-one" theory is not cognizable in the public employment context and was foreclosed in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 605 (2008). In *Engquist*, the Court concluded this theory of Equal Protection "is simply a poor fit in the public employment context," and reasoned that

> [t]o treat employees differently is not to classify them in a way that raises [E]qual [P]rotection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.

*Id.* The Court emphasized, though, that its holding did not affect the viability of class-based discrimination claims in the public employment context. *Id.*

38

**2**

Brown does not allege that he is a member of a particular class that is being treated differently from other groups of individuals. Rather, he asserts Defendants engaged in viewpoint discrimination, or that he is being singled out and intentionally treated differently by Defendants without a rational basis. However, contrary to his assertions, he is alleging a quintessential "class-of-one" Equal Protection claim, so the district court did not err in recognizing his Equal Protection claim for what it is.

In support of his Equal Protection claim, Brown cites to *Police Department of City of Chicago v. Mosley* for the proposition that "under the Equal Protection Clause . . . government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." 408 U.S. 92, 96 (1972). *Mosely* addressed whether a city ordinance prohibiting certain types of picketing but not others was justified by an appropriate governmental interest as required by the Equal Protection Clause. *Id.* at 94–95. The Court ultimately concluded the ordinance furthered no legitimate government interest because the "government must afford all points of view an equal opportunity to be heard." *Id.* at 96. Unlike *Mosely*, this case does not involve an ordinance by the City of Tulsa. Also, given that *Mosely* neither concerns a "class-of-one" claim nor public employment, it offers no support for Brown's argument.

Because a class-of-one theory is not viable in the public employment context, *Engquist*, 553 U.S. at 605, Brown fails to state a claim for relief under the Fourteenth Amendment's Equal Protection Clause. Accordingly, we affirm the dismissal of this claim against both the City of Tulsa and Chief Jordan in his individual capacity.

## C

Lastly, Brown challenges the district court's decision to decline exercising supplemental jurisdiction over his state law claim after dismissing the federal claims.

We review "a denial of supplemental jurisdiction for abuse of discretion." *Nielander v. Bd. Of Cty. Comm'rs*, 582 F.3d 1155, 1172 (10th Cir. 2009). In any civil action where a district court has original jurisdiction, the court "shall have supplemental jurisdiction" over related claims that "form part of the same case or controversy" under Article III of the United States Constitution. 28 U.S.C. § 1367(a). However, a district court may decline to exercise supplemental jurisdiction over a related claim if it has dismissed all claims over which it had original jurisdiction. *Id.* at § 1367(c)(3).

Here, the district court declined to exercise supplemental jurisdiction over Brown's state law claim after dismissing his two 42 U.S.C. § 1983 claims. The court had original jurisdiction over the § 1983 claims pursuant to 28 U.S.C. § 1331, which provides district courts with jurisdiction over civil actions

40

arising under Federal law. Because we conclude that the district court erred in dismissing Brown's First Amendment claim, we reverse its decision to decline supplemental jurisdiction over the state law claim and remand for reconsideration. *See, e.g.*, *Greer v. Dowling*, 947 F.3d 1297, 1304 n.5 (10th Cir. 2020) (remanding for district court to reconsider exercising supplemental jurisdiction over state law claim after reversing dismissal of federal claim); *Baca v. Sklar*, 398 F.3d 1210, 1222 n.4 (10th Cir. 2005) (same); *Sw. Air Ambulance, Inc. v. Las Cruces*, 268 F.3d 1162, 1179 (10th Cir. 2001) (same).

## III

In conclusion, we **AFFIRM** the dismissal of Brown's Fourteenth Amendment Equal Protection claim against both the City of Tulsa and Chief Jordan in his individual capacity for failure to state a claim under Rule 12(b)(6), we **REVERSE** the dismissal of Brown's First Amendment free speech claim against both the City of Tulsa and Chief Jordan in his individual capacity for failure to state a claim under Rule 12(b)(6) and the district court's decision to decline exercising supplemental jurisdiction over Brown's state law claim, and we **REMAND** for further proceedings consistent with this opinion.

41